Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY NAGLE, derivatively on behalf of ROCKET LAB USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> PETER BECK, ADAM SPICE, NINA ARMAGNO, EDWARD FRANK, MATT OCKO, JON A. OLSON, KENNETH POSSENRIEDE, MERLINE SAINTIL, and ALEX SLUSKY, <br><br> Defendants, <br><br> and <br><br> ROCKET LAB USA, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br> <u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u> |

## INTRODUCTION

Plaintiff Jeffrey Nagle ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Rocket Lab USA, Inc. ("Rocket Lab" or

the "Company"), files this Verified Shareholder Derivative Complaint against defendants Peter Beck ("Beck"), Adam Spice ("Spice"), Nina Armagno ("Armagno"), Edward Frank ("Frank"), Matt Ocko ("Ocko"), Jon A. Olson ("Olson"), Kenneth Possenriede ("Possenriede"), Merline Saintil ("Saintil"), and Alex Slusky ("Slusky") (collectively, the "Individual Defendants," and together with Rocket Lab, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Rocket Lab, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rocket Lab, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from November 12, 2024 and February 25, 2025, inclusive (the "Relevant Period").

2.    Rocket Lab is a space company that provides services for spacecraft design and launch, manufacturing and other spacecraft and on-orbit management solutions, and spacecraft components.

3.    Rocket Lab announced that it had plans to develop a reusable-ready, medium-capacity launch vehicle in March 2021. The new vehicle is referred to as the Neutron

Verified Shareholder Derivative Complaint

Launch Vehicle ("Neutron").

4.      In early 2024, the Company announced that it would conduct a test launch of Neutron in mid-2025 before offering three commercial launches in 2026 and five commercial launches in 2027.

5.      The Relevant Period began on November 12, 2024, when the Company issued a press release (the "Q3 2024 Earnings Release") announcing its financial results for the third quarter of the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"). The Q3 2024 Earnings Release announced the Company's "Significant achievements for the quarter," which included "*signing a launch service agreement for multiple launches on Neutron with a confidential commercial satellite constellation customer*."[1] The Q3 2024 Earnings Release further revealed there was "*continued progress across Neutron and space systems*."

6.      Throughout the Relevant Period, the Individual Defendants issued or caused the Company to issue positive updates regarding the Neutron launch and did not offer any indication that the launch would be delayed.

7.      The truth emerged on February 25, 2025 when Bleecker Street Research published a report (the "Bleecker Street Report") claiming, *inter alia*, that the Company "has materially misled investors about the likelihood that its Neutron rocket will launch in mid-2025." The Bleecker Street Report also announced that Rocket Lab's plans for three barge landing tests, originally scheduled to take place between September 2024 and March 2025, had been delayed to take place between September 2025 until as late as March 2026.

8.      The Bleecker Street Report also revealed that the Company was experiencing substantial delays in preparing the launch pad, including a potable water issue that is supposedly not scheduled to be fixed until January 2026, potentially further delaying the launch.

9.      Lastly, the Bleecker Street Report claims that the Company's sole contract

---

[1] All emphasis added unless stated otherwise.

thus far was with an "unreliable startup" named E-Space, which the Bleecker Street Report described as "risk item." Additionally, the supposed "contract is not a full-price deal, contrary to what Rocket Lab has said."

10.    On this news, the price of the Company's stock fell $2.21 per share, or approximately 9.8%, from a close of $22.49 per share on February 24, 2025, to close at $20.28 per share on February 25, 2025.

11.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the initial plans for three barge landing tests were substantially delayed; (2) preparation of the launch pad was delayed by, *inter alia*, a critical potable water issue that was not scheduled to be fixed until January 2026; (3) due to these issues, it was highly unlikely the Company's Neutron rocket would not be able to launch in mid-2025 as expected; and (4) the Company's sole contract regarding Neutron has made with an unreliable partner at a discount. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

12.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while five of the Individual Defendants engaged in improper insider sales, netting total proceeds of ***approximately $6.4 million***.

14.    The Company has been substantially damaged as a result of the Individual

Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.    In light of the Individual Defendants' misconduct—which has subjected the Company; its co-founder, President, Chief Executive Officer ("CEO"), and Chairman of the Company's Board of Directors (the "Board"); and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Beck's and Spice's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Rocket Lab is headquartered in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Rocket Lab. Plaintiff has continuously held Rocket Lab common stock since first purchasing shares on August 8, 2023.

### Nominal Defendant Rocket Lab

23.     Rocket Lab is a Delaware corporation with principal executive offices 3881 McGowen Street, Long Beach, California, 90808. Rocket Lab's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "RKLB."

### Defendant Beck

24.     Defendant Beck founded the Company in 2006, and has served on the Board and as President and CEO of the Company since July 2013. Defendant Beck has served as the Chairman of Board since May 2021.

25.     The Schedule 14A the Company filed with the SEC on April 24, 2024 (the "2024 Proxy Statement")stated the following about Defendant Beck:

**Peter Beck.** Mr. Beck is the Founder, President and Chief Executive Officer of Rocket Lab. Mr. Beck founded the company in 2006 and has served on the Legacy Rocket Lab board and as the President and Chief Executive Officer since July 2013 and was appointed Chairman of the Legacy Rocket Lab board in May 2021 and our Board since August 2021 (references to "Legacy Rocket Lab" mean this company prior to its merger with Vector Acquisition

Verified Shareholder Derivative Complaint

Corporation on August 25, 2021). Further, he served as our Treasurer from July 2013 until May 2021 and as our Secretary and Chief Financial Officer from July 2013 until September 2015. From 2013, Mr. Beck led the development of the Electron launch vehicle, which was designed from the ground up to accommodate a high launch rate business model to meet the needs of customers for small launch services. Under Mr. Beck's leadership, Rocket Lab pioneered advanced aerospace manufacturing techniques for Electron, including 3D printed rocket engines, electric-pump-fed rocket engines and fully carbon composite fuel tanks. Mr. Beck also led the development of our private orbital launch site, LC-1, located in Mahia, New Zealand, which required the establishment of an international treaty and legislation to enable us to use U.S. launch and spacecraft technology that otherwise would not be permitted for launches from foreign soil.

**Defendant Spice**

26.    Defendant Spice has served as the Company's CFO since May 2018.

27.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Spice made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| November 25, 2024 | 62,511 | $24.15 | $1,509,366 |

Thus, in total, before the fraud was exposed, Defendant Spice sold 62,511 shares of Company stock on inside information, for which he received approximately $1.5 million in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

28.    The leadership page of the Company's website[2] stated the following about Defendant Spice:

Mr. Spice has served as Rocket Lab's Chief Financial Officer since May 2018. From January 2011 until May 2018, he was Vice President and Chief Financial Officer at MaxLinear, Inc., a provider of radio frequency, analog

[2] https://www.rocketlabusa.com/about/team/

and mixed-signal integrated circuits for the connected home, wired and wireless infrastructure, and industrial and multimarket applications. From October 2009 to November 2010, Mr. Spice was the Chief Financial Officer of Symwave Corporation, a venture backed fabless semiconductor company until its sale to Standard Microsystems Corporation (SMSC). From July 2000 until September 2009, Mr. Spice held a variety of financial and operational executive roles at Broadcom Corporation, a creator of semiconductor solutions for wired and wireless communications. From June 1996 until July 2000, Mr. Spice worked as a finance manager for Intel, a microchips manufacturer. Mr. Spice has a Bachelor of Business Administration from the Brigham Young university and an MBA from The University of Texas at Austin.

**Defendant Armagno**

29.    Defendant Armagno has served as a Company director since November 2023. She also serves as the Chair of the Government Security Committee and as a member of the Nominating and Corporate Governance Committee.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Armagno made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| December 11, 2024 | 10,000 | $23.63 | $236,345 |

Thus, in total, before the fraud was exposed, Defendant Armagno sold 10,000 shares of Company stock on inside information, for which she received approximately $236,345 in total proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

31.    The 2024 Proxy Statement stated the following about Defendant Armagno:

**Lt. Gen. Nina M. Armagno (Ret.).** Lt. Gen. Armagno was appointed as a member of our Board in November 2023 and serves on our Government Security Committee. Lt. Gen. Armagno served as the Director of Staff,

Headquarters for U.S. Space Force since August 2020. From June 2018 to August 2020, she served as the Director, Space Programs, Office of the Assistant Secretary for Acquisition where she directed the development and procurement of space programs for the Air Force and crafted program strategies for representing Air Force positions to Headquarters U.S. Air Force, the Office of the Secretary of Defense, Congress, and the White House. Prior to 2018, Lt. Gen. Armagno was the Director, Plans and Policy, U.S. Strategic Command where she was responsible for space and nuclear weapons plans, policy and employment. She is the only person who commanded both the Eastern and Western test and launch ranges. She is also a member of The Council on Foreign Relations. Lt. Gen. Armagno holds a Bachelor of Science in Biology from the U.S. Air Force Academy, a Master of Arts in Education Administration and Management from Chapman University, and a Master of Science in National Security Studies from National War College. We believe Lt. Gen. Armagno is qualified to serve on our Board due to her demonstrated leadership and experience in the U.S. Air Force and U.S. Space Force.

**Defendant Frank**

32.    Defendant Frank has served as a Company director since September 2022. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee.

33.    The 2024 Proxy Statement stated the following about Defendant Frank:

**Edward Frank.** Dr. Frank has served as a member of our Board since September 2022 and currently serves as chair of our Compensation Committee and serves on our Audit Committee. Since August 2022, he has served as Executive Chair of Gradient Technologies. Prior to Gradient, he was co-founder and CEO of Cloud Parity Inc., a voice-of-the-customer startup in the SF Bay Area, founded in late 2013. From 2009 through 2013, he was Vice President of Macintosh Hardware Systems Engineering at Apple, Inc. where he led the development of four generations of Macintosh laptop and desktop computers. Before joining Apple, he was Corporate Vice President of Research and Development at Broadcom, where he was responsible for Broadcom's overall engineering execution and played a key role in corporate business and IP strategy. Prior to becoming Corporate VP of R&D, Frank co-founded and led the engineering group for Broadcom's Wireless LAN business, which is now one of Broadcom's largest business units. Frank joined Broadcom in May 1999 following its acquisition of Epigram, Inc., where he

was the founding CEO and Executive Vice President. From 1993 to 1996, he was a co-founder and Vice President of Engineering of NeTpower, Inc., a computer workstation manufacturer. From 1988 to 1993, Frank was a Distinguished Engineer at Sun Microsystems, Inc., where he co-architected several generations of Sun's SPARCstations and was a principal member of Sun's Green Project, which developed the precursor to the Java cross-platform web programming language. He is a named inventor on over 50 issued patents, and serves as an advisor to and/or board member of several startups. In addition to Rocket Lab, he serves on the board of directors of Analog Devices (Nasdaq: ADI), and SiTime (Nasdaq: SITM), and was previously on the board of directors of Cavium, FusionIO, Marvell (Nasdaq: MRVL), and Quantenna (Nasdaq: QTNA). Dr. Frank holds BSEE and MSEE degrees from Stanford University. He received a Ph.D. in Computer Science from Carnegie Mellon University, where he was a Hertz Foundation Fellow. He is a member of the National Academy of Engineering, a Fellow of the Institute for Electrical and Electronic Engineers, and a Board Leadership Fellow of the National Association of Corporate Directors. We believe that Dr. Frank is qualified to serve on our Board due to his demonstrated leadership in his field and his experience.

**Defendant Ocko**

34.    Defendant Ocko has served as a Company director since August 2021. He also serves as a member of the Compensation Committee.

35.    The 2024 Proxy Statement stated the following about Defendant Ocko:

**Matt Ocko**. Mr. Ocko has served as a member of our Board since August 2021 and as a member of the Legacy Rocket Lab board since January 2017. Mr. Ocko serves on our Audit Committee and our Compensation Committee. Since 2010, Mr. Ocko has served as the Co-Founder and Co-Managing Partner of venture capital fund DCVC. Prior to co-founding DCVC, Mr. Ocko was an investor at numerous firms, including VantagePoint Ventures, LLC, SOFTBANK Technology Ventures Corp (aka Mobius Venture Capital), Sevin Rosen Funds and Helix Investments. From 1984 – 1991, Mr. Ocko served as a member of the board of directors (in his capacity as co-founder) and Vice President of Research and Development of Da Vinci Systems, an e-mail software vendor. Mr. Ocko has a degree in Physics from Yale University. We believe that Mr. Ocko is qualified to serve as a member of our Board because of his extensive experience in the venture capital industry, advising technology companies as both a director and executive.

**Defendant Olson**

36.    Defendant Olson has served as a Company director since August 2021. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.

37.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Olson made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|------------------------|--------------|
| November 19, 2024 | 50,000 | $20.69 | $1,034,315 |

Thus, in total, before the fraud was exposed, Defendant Olson sold 50,000 shares of Company stock on inside information, for which he received approximately $1 million in total proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

38.    The 2024 Proxy Statement stated the following about Defendant Olson:

**Jon Olson.** Mr. Olson has served as a member of our Board since August 2021 and as a member of the Legacy Rocket Lab board since June 2021. Mr. Olson is the chair of our Audit Committee and serves on our Nominating and Corporate Governance Committee. Mr. Olson served as the Chief Financial Officer at Xilinx, Inc., a provider of programmable semiconductor platforms, from June 2005 until his retirement in July 2016. While serving as Chief Financial Officer, he also held a variety of other senior management positions at Xilinx, including most recently as Executive Vice President from May 2014 to July 2016 and, prior to that, Senior Vice President of Finance from August 2006 to May 2014 and Vice President of Finance from June 2005 to August 2006. Prior to joining Xilinx, he served from 1979 to 2005 at Intel Corporation in various senior financial positions, including Vice President, Finance and Enterprise Services and Director of Finance. Mr. Olson currently serves as a member of the board of directors of AMD, Inc and Kulicke and Soffa Industries, Inc. and has previously served as a member of the board of directors of Xilinx, Inc, Mellanox Technologies, Ltd. and InvenSense Inc.,

among others. Mr. Olson holds an MBA in Finance from Santa Clara University and a B.S. in Accounting from Indiana University. We believe Mr. Olson is qualified to serve as a member of our Board because of his financial expertise and extensive experience advising technology companies as both a director and executive.

**Defendant Possenriede**

39.    Defendant Possenriede has served as a Company director since August 2024. He also serves as a member of the Audit Committee.

40.    The Form 8-K filed by the Company on August 21, 2024 stated the following about Defendant Possenriede:

Mr. Possenriede joins the Company after a 35-year career at Lockheed Martin Corporation in financial leadership positions, including most recently serving as its Executive Vice President and Chief Financial Officer from February 2019 until his retirement in August 2021. Prior to becoming the CFO at Lockheed Martin Corporation, Mr. Possenriede served as Vice President of Finance and Program Management for Lockheed Martin Aeronautics Company from April 2016 to February 2019 where he was responsible for leading finances and program management processes, including accounting, contracts, business management, financial planning, scheduling and earned value. Mr. Possenriede also served as Vice President and Treasurer for Lockheed Martin Corporation from 2011 to April 2016. In that role, he was responsible for all aspects of the corporation's worldwide banking activity, including global treasury operations, foreign exchange and capital markets, rating agency relations, capital planning, facilities and risk management. Mr. Possenriede also served as Lockheed Martin Corporation's Vice President of Finance for the Electronic Systems organization, where he was responsible for all aspects of the business unit's financial and contractual processes and commitments. Mr. Possenriede holds a Master of Business Administration from the University of Michigan and bachelor's degree from Rutgers University in economics. He also currently serves as an advisor to the Rutgers Foundation Board of Directors. Mr. Possenriede is qualified to serve on the Board due to his demonstrated leadership and experience in related fields.

**Defendant Saintil**

41.    Defendant Saintil has served as a Company director since June 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

42.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Saintil made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|-----------------------|--------------|
| November 26, 2024 | 50,000 | $25.55 | $1,277,475 |

Thus, in total, before the fraud was exposed, Defendant Saintil sold 50,000 shares of Company stock on inside information, for which she received approximately $1.3 million in total proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

43.    The 2024 Proxy Statement stated the following about Defendant Saintil:

**Merline Saintil.** Ms. Saintil has served as a member of our Board since June 2021 and currently serves as our lead independent director, chair of our Nominating and Corporate Governance Committee and serves on our Compensation Committee. Ms. Saintil is an experienced senior executive, having served a number of Fortune 500 and privately-held companies, including Change Healthcare Inc. (Nasdaq: CHNG), Intuit Inc. (Nasdaq: INTU), Yahoo! Inc., PayPal Holdings Inc. (Nasdaq: PYPL), Adobe Inc. (Nasdaq: ADBE) and Joyent, Inc. From April 2019 to February 2020, Ms. Saintil served as the Chief Operating Officer, R&D/IT, for Change Healthcare Inc., a payment management software company. Prior to joining Change Healthcare, Ms. Saintil was a senior executive in the Product & Technology group at Intuit Inc., a software company, from November 2014 to August 2018, where her core responsibilities included driving global strategic growth priorities, leading merger and acquisition integration and divestitures and leading business operations for nearly half of Intuit's workforce. Prior to Intuit, Ms. Saintil served as Head of Operations for Mobile & Emerging Products for Yahoo! Inc. from January 2014 to November 2014. Prior to joining Yahoo!, Ms. Saintil held various roles at Joyent, Inc., a software

company, from November 2011 to September 2013; PayPal Holdings Inc., a payments company, from July 2010 to November 2011; Adobe Inc., a software company, from April 2006 to July 2010; and Sun Microsystems, Inc. from October 2000 to April 2006. Ms. Saintil has served on the boards of directors of Gitlab, Inc. (Nasdaq: GTLB) since October 2020, Symbotic (Nasdaq: SYM) since June 2022, Evolv Technology Holdings, Inc. (Nasdaq: EVLV) since January 2021 and TD SYNNEX Corporation (NYSE: SNX) since September 2021. Ms. Saintil is the Chair of the Nominating and Governance Committee of Symbotic and Evolv Technology. She is certified in Cybersecurity Oversight by the National Association of Corporate Directors and the Carnegie Mellon Software Engineering Institute. Ms. Saintil holds a Bachelor of Science degree in Computer Science from Florida A&M University and a Master of Science degree in Software Engineering Management from Carnegie Mellon University and has completed Stanford Directors' College and Harvard Business School's executive education program. She is certified in Cybersecurity Oversight by the National Association of Corporate Directors and the Carnegie Mellon Software Engineering Institute and has completed Stanford Directors' College and Harvard Business School's executive education programs. Due to her significant experience in product, technology and business operations, we believe that Ms. Saintil contributes her leadership skills and business experience to the Board.

**Defendant Slusky**

44.     Defendant Slusky has served as a Company director since August 2021.

45.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Slusky made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|------------------------|--------------|
| December 2, 2024 | 50,000 | $24.28 | $1,214,230 |
| December 3, 2024 | 50,000 | $23.00 | $1,150,080 |

Thus, in total, before the fraud was exposed, Defendant Slusky sold 100,000 shares of Company stock on inside information, for which he received approximately $2.4 million

in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

46.    The 2024 Proxy Statement stated the following about Defendant Slusky:

**Alex Slusky.** Mr. Slusky has served as a member of our Board since August 2021 and previously as the Chairman of the Vector Acquisition Corporation board of directors since its initial public offering. Mr. Slusky serves on our Nominating and Corporate Governance Committee. Since its inception in 1997, Mr. Slusky has served as Managing Partner and Chief Investment Officer of Vector Capital and its affiliated funds. He has also served as the Chairman of the board of Vector Acquisition Corporation II, a special purpose acquisition company, since 2021, served as a director of Cambium Networks Corp., a wireless technology company, since 2011 and served as a director of Technicolor SA, a manufacturer of digital media solutions, from July 2013 until 2016. From 1995 until 1997, Mr. Slusky led the technology equity practice at Ziff Brothers Investments, managing a portfolio of public and private technology investments which later became Vector Capital. From 1992 until 1995, Mr. Slusky was an investor at New Enterprise Associates, a venture capital firm where he focused on venture investments in software, communications and digital media. Mr. Slusky has a degree in Economics from Harvard University and an MBA from Harvard Business School. We believe that Mr. Slusky is qualified to serve as a member of our Board because of his significant investment and business management experience and deep technical experience in technology companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

47.    By reason of their positions as officers, directors, and/or fiduciaries of Rocket Lab and because of their ability to control the business and corporate affairs of Rocket Lab, the Individual Defendants owed Rocket Lab and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Rocket Lab in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Rocket Lab and its shareholders so as to benefit all shareholders equally.

48.    Each director and officer of the Company owes to Rocket Lab and its

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Rocket Lab, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

50.     To discharge their duties, the officers and directors of Rocket Lab were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

51.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Rocket Lab, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

52.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business

prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

53.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Rocket Lab were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Rocket Lab's corporate governance and applicable business practice standards;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Rocket Lab conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Rocket Lab and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Rocket Lab's operations would

comply with all applicable laws and Rocket Lab's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.    Each of the Individual Defendants further owed to Rocket Lab and its shareholders the duty of loyalty requiring that each favor Rocket Lab's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

55.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Rocket Lab and were at all times acting within the course and scope of such agency.

56.    Because of their advisory, executive, managerial, directorial, and controlling positions with Rocket Lab, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

57.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Rocket Lab.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

58.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

59.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

60.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Rocket Lab was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct

part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

62.     At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Rocket Lab and was at all times acting within the course and scope of such agency.

## ROCKET LAB'S CODE OF ETHICS AND EMPLOYEE CONDUCT

63.     Rocket Lab's Code of Ethics and Employee Conduct (the "Code of Ethics") states that it "applies to all directors, officers, and employees of Rocket Lab and its subsidiaries, who, unless otherwise specified, are referred to together in the Code as 'employees.'"

64.     The Code of Ethics explains that the purposes of the Code of Ethics are:

- Honest and ethical conduct, including (i) the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; (ii) the ethical conduct of our business; and (iii) the ethical management of our relationships and transactions with customers, vendors, and anyone with whom we conduct business;

- Full, fair, accurate, timely, and understandable disclosure in reports and documents we file with, or submit to various government agencies, and in other public communications we make;

- Compliance with applicable governmental laws, rules, and regulations;

- Prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

- Accountability for adherence to the Code.

65.     In the section, "Standards of Conduct," the Code of Ethics states:

The Company expects all employees and directors to act with the highest standards of honesty and ethical conduct.  The Company considers honest conduct to be conduct that is free from fraud or deception and is characterized by integrity.   The Company considers ethical conduct to be conduct conforming to accepted professional standards of conduct.  Ethical conduct

includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, as discussed below.

66.    In the section, "Reporting Procedures," the Code of Ethics states, in relevant part:

The Company expects employees to assist Rocket Lab in enforcing the Code and to report possible violations to appropriate personnel.  Violations may occur as a result of someone's intentional act or, in some cases, because of an unintentional act, oversight, or error.  Employees should report suspected violations regardless of whether they believe the violation is or was intentional.  Any report of a suspected violation of law or of this Code should be made to a local supervisor or local People & Culture Representative.

67.    In the section, "Amendment, Modification and Waiver," the Code of Ethics states:

This Code may be amended or modified by the Board of Directors or a committee of the Board of Directors.  Any amendments of Part A or Part B of this Code must be promptly disclosed to stockholders if and as required by law or the rules of the stock exchange on which the Company's stock is traded.

Any waiver of the provisions of Part A or Part B of this Code for a director, executive officer and any financial or accounting officer at the level of the principal accounting officer or controller or above, may be made only by the Board of Directors, and must be promptly disclosed to stockholders if and as required by law or the rules of the stock exchange or over the counter trading system on which the Company's stock is traded or quoted.  Waivers with respect to other employees or applicable contractors may be made only by the Company's Compliance Officer.

Any waiver of this Code with respect to a conflict of interest transaction required to be disclosed pursuant to Item 404 of Regulation S-K promulgated under the Securities Act of 1933, as amended, must be approved in advance by the Company's Audit Committee.

68.    In the section, "Financial Records and Public Disclosure," the Code of Ethics states, in relevant part:

Every Rocket Lab financial record – including sales records, time sheets, expense reports, books and ledgers, and other financial data and records – must be accurately and timely prepared and must be prepared in accordance with all applicable laws, principles, and standards. The integrity of our financial transactions and records is critical to the operation of our business and to maintaining the confidence and trust of our stockholders, customers, suppliers, and employees.

*General Principles Applicable to Employees*

Each employee having any responsibility for, or involvement in, financial reporting or accounting must have an appropriate understanding of relevant accounting and financial reporting principles, standards, laws, rules, and regulations as well as Rocket Lab's financial and accounting policies, controls, and procedures.

Each employee having any responsibility for, or involvement in, the customer sales and support process or managing relationships with Rocket Lab's vendors must understand the accounting and financial reporting implications of Rocket Lab's transactions with these parties. All such employees should consult with the Finance Department to discuss any requests for nonstandard terms or conditions. All such employees are responsible for ensuring the accuracy and completeness of all documentation relating to customer sales and support or vendor transactions. **The terms and conditions of any transaction between Rocket Lab and any customer or vendor must be fully and completely reflected in the documentation governing the transaction. The existence of oral or written agreements or understandings of any kind that are not part of the documentation relating to the transaction and that are not reported to the Finance Department as part of such transaction is an absolute violation of this Code and may constitute grounds for immediate termination of employment, consistent with applicable laws**. Examples of such agreements or understandings include (but are not limited to) requests for payment terms that differ from those reflected in purchase orders or other documentation or rights to return or cancel orders or products that are not reflected in the documentation. **Employees involved in customer and vendor transactions are responsible for consulting with the Finance Department if any customer or vendor requests that Rocket Lab consent to any term or condition that would not be fully reflected in the documentation relating to the transaction**.

Verified Shareholder Derivative Complaint

Even employees not directly involved in financial reporting, accounting, sales or purchasing will likely come into contact with financial records or reports or with other documents on which employees preparing financial statements will depend. These may include vouchers, time sheets, invoices, or expense reports. We expect every employee, regardless of familiarity or involvement with finance or accounting matters or principal job responsibilities or functions, to use all reasonable efforts to ensure that every business record or report with which the employee deals is accurate, complete, reliable, and timely submitted.

(Emphasis in original).

69.    In the section, "Compliance with Laws, Rules and Regulations," the Code of Ethics states:

Employees and directors must comply with all laws, rules and regulations applicable to the Company and its business, as well as applicable Company policies and procedures. Each employee and director must acquire appropriate knowledge of the legal requirements relating to their duties sufficient to enable them to recognize potential problems and to know when to seek advice from the Company's Compliance Officer. Violations of laws, rules and regulations may subject the violator to individual criminal or civil liability, as well as to discipline and/or enforcement action by the Company. These violations may also subject the Company to civil or criminal liability or the loss of business.

When dealing with customers, partners, and suppliers who may be publicly traded companies, compliance with United States securities laws is of utmost importance. The Company has adopted an Insider Trading and Disclosure Policy to help ensure compliance with these laws. Violations of this policy will be treated as violations of this Code.

Any questions as to the applicability of any law, rule or regulation should be directed to the Company's Compliance Officer.

70.    In the section, "Conflicts of Interest," the Code of Ethics states, in relevant part:

An employee's personal activities and relationships must not conflict, or

appear to conflict, with those of Rocket Lab. An employee's decisions and actions in the course of employment should be based on the best interests of Rocket Lab, not based on personal relationships or business and financial interests.

We expect each employee to evaluate personal relationships and activities to determine whether a conflict exists or could appear to exist and to avoid such relationships and activities. Common conflicts arise through the employment or business activities of a spouse, partner, significant other, or other relative or through personal or business relationships through which an employee or a spouse, partner, significant other, or relative may have a personal or economic relationship. Any situation where it may be difficult for an employee to perform work impartially, objectively, or effectively and in the best interests of Rocket Lab could suggest that a conflict exists.

Each employee is required to disclose immediately to a supervisor, the Finance Department, or the People & Culture Department if the employee becomes aware that any personal relationship or business or financial interest conflicts, or may appear to conflict, with those of Rocket Lab. Supervisors with concerns that any actual or suspected conflict, whether their own or related to a reporting employee, would violate the Code should contact the Finance Department or People & Culture Department.

71.    In the section, "Recordkeeping," the Code of Ethics states:

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the transactions and matters to which they relate and must conform both to applicable legal requirements and to the Company's system of internal controls. All assets of the Company must be carefully and properly accounted for. The making of false or misleading records or documentation is strictly prohibited. Unrecorded funds or assets should not be maintained. Please refer also to the more detailed requirements under Section I (Financial Records and Public Disclosure).

The Company complies with all laws and regulations regarding the preservation of records. Records should be retained or destroyed only in accordance with the Company's document retention policies. Any questions about these policies should be directed to the Company's Compliance Officer.

Verified Shareholder Derivative Complaint

72.    In the section, "Disclosure," the Code of Ethics states:

The information in the Company's public communications, including filings
with the Securities and Exchange Commission, must be full, fair, accurate,
timely and understandable.  All employees and directors are responsible for
acting in furtherance of this policy.  In particular, each employee and director
is responsible for complying with the Company's disclosure controls and
procedures and internal controls for financial reporting.  Any questions
concerning the Company's disclosure controls and procedures and internal
controls for financial reporting should be directed to the Company's
Compliance Officer.  Please refer also to the more detailed requirements under
Section I (Financial Records and Public Disclosure).

Anyone that believes that questionable accounting or auditing conduct or
practices have occurred or are occurring should refer to the Company's Audit
Committee Complaint Procedures, which is available on Rocket Lab's
intranet.

73.    In the section, "Insider Trading," the Code of Ethics states:

The purpose of the Company's insider trading policy is to establish guidelines
to ensure that all employees and directors comply with laws prohibiting
insider trading.  Employees and directors also may not trade in stocks of other
companies about which they learn material, nonpublic information through
the course of their employment or service with the Company.

Any questions as to whether information is material or has been adequately
disclosed should be directed to the Company's Compliance Officer.
Additional information regarding insider trading can be found in the
Company's Insider Trading and Disclosure Policy.

74.    In violation of the Code of Ethics, the Individual Defendants conducted little,
if any, oversight of the Individual Defendants' scheme to issue materially false and
misleading statements to the public and to facilitate and disguise the Individual
Defendants' violations of law, including but not limited to, breaches of fiduciary duty,
abuse of control, gross mismanagement, waste of corporate assets, violations of the
Exchange Act, and unjust enrichment, including five Defendants who sold Company stock

on inside information. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Rocket Lab's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## ROCKET LAB'S AUDIT COMMITTEE CHARTER

75. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states the purpose of the Audit Committee as:

> The general purposes of the Audit Committee of the Board of Directors (the "Audit Committee") of Rocket Lab USA, Inc. (the "Company") are to (A) assist the Board of Directors (the "Board") in its oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the Company's accounting and financial reporting processes and the audits of the financial statements of the Company, and (4) the qualifications, independence and performance of the Company's independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "Independent Auditors"); and (B) prepare the report required by the rules of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

> In addition to the specific powers and responsibilities delegated to the Audit Committee in this Charter, the Audit Committee shall also carry out and may exercise any other powers or responsibilities as are assigned by law, the Company's organizational documents or Corporate Governance Guidelines, or as may be delegated to it by the Board from time to time. The powers and responsibilities delegated by the Board to the Audit Committee in this Charter or otherwise shall be exercised and carried out by the Audit Committee as it deems appropriate without requirement of Board approval, and any decision (including any decision to exercise or refrain from exercising any of the powers delegated to the Audit Committee hereunder) shall be made by the Audit Committee in its sole discretion. While acting within the scope of the powers and responsibilities delegated to it, the Audit Committee shall have and may exercise all the powers and authority of the Board.

76.    In the section "Responsibilities and Authority," under the subheading "Matters Related to the Internal Audit Function," the Audit Committee Charter states the responsibilities of the Audit Committee as:

1. The Audit Committee will oversee and monitor the performance of the Company's Internal Audit function. The Internal Audit Department will have a direct reporting relationship to the Committee. With regards to operation matters, the Department will additionally report to the CFO.

2. The Committee will review internal audit plans for the upcoming year, review significant reports prepared by the Department, and meet directly with the lead internal auditor of the Company. The Committee will review and advise on the organizational structure of the Internal Audit function and on the selection and removal of the lead internal auditor.

77.    In the same section, under the subheading "Audited Financial Statements and Annual Audit," the Audit Committee Charter states the responsibilities of the Audit Committee as:

1. The Audit Committee shall have general responsibility for fulfilling the Board's oversight role with respect to (i) the Company's preparation and disclosure of its annual financial results and condition, including disclosures contained in earnings releases, supplemental financial disclosures or Annual Reports on Form 10-K, (ii) any internal audit function maintained by the Company and (iii) the audit of the Company's annual financial results and condition by the Independent Auditors.

2. The Audit Committee shall review and discuss with management (including the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to collectively as the "Senior Accounting Executive")) and with the Independent Auditors the Company's annual audited financial statements, including all critical accounting policies and practices used or to be used by the Company.

3. The Audit Committee shall discuss with the Independent Auditors those

matters required to be discussed by the applicable requirements of the PCAOB and the Securities and Exchange Commission (the "SEC"), including, as applicable, those matters brought to the attention of the Audit Committee by the independent auditors pursuant to Auditing Standard No. 16 adopted by the PCAOB ("AS 16").

4. The Audit Committee shall receive the written disclosures and the letter from the Independent Auditors required by applicable requirements of the PCAOB regarding the Independent Auditors' communications with the Audit Committee concerning independence, and discuss the Independent Auditors' independence with the Independent Auditors.

5. The Audit Committee shall review any reports made by the Chief Executive Officer and Chief Financial Officer of the Company to the Audit Committee with respect to (1) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

6. Based on the Audit Committee's review and discussions (1) with management of the audited financial statements, (2) with the Independent Auditors of the matters required to be discussed by the applicable requirements of the PCAOB and the SEC, and (3) with the Independent Auditors concerning the Independent Auditors' independence, the Audit Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

7. The Audit Committee shall prepare or oversee the Audit Committee report required by Item 407(d) of Regulation S-K of the Exchange Act (or any successor provision) to be included in the Company's annual proxy statement.

78.   In the same section, under the subheading "Unaudited Quarterly Financial Statements," the Audit Committee Charter states the responsibilities of the Audit

Verified Shareholder Derivative Complaint

Committee as:

1. The Audit Committee shall have general responsibility for fulfilling the Board's oversight role with respect to the Company's preparation and disclosure of its quarterly financial results and condition, including disclosures contained in earnings releases, supplemental financial disclosures or Quarterly Reports on Form 10-Q.

2. The Audit Committee shall review and discuss with management and the Independent Auditors, before the filing of the Company's Quarterly Reports on Form 10-Q, the Company's quarterly financial statements and any matters required to be discussed with management or the Independent Auditors by the applicable requirements of the PCAOB and the SEC.

79. In the same section, under the subheading "Risk Assessment and Management," the Audit Committee Charter states the responsibilities of the Audit Committee as:

1. The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

2. The Audit Committee shall periodically review the Company's enterprise risk management framework and major risk exposures, including the Company's enterprise risk management processes.

3. In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major risk exposures, including financial, operational, privacy, security, cybersecurity, competition, legal, regulatory and accounting risk exposures and the steps that the Company's management has taken to monitor and control such exposures.

80. In the same section, under the subheading "Legal and Regulatory Compliance," the Audit Committee Charter states the responsibilities of the Audit Committee as:

1. The Audit Committee shall have general responsibility for fulfilling the Board's oversight role with respect to the compliance of the Company and its subsidiaries with applicable legal and regulatory requirements.

81.   In the same section, under the subheading "Related Person Transactions," the Audit Committee Charter states the responsibilities of the Audit Committee as:

1. The Audit Committee shall be responsible for reviewing, considering and approving "related person transactions" pursuant to the Company's Corporate Governance Guidelines.

82.   In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

83.   Rocket Lab is a space company that provides services for designs, manufactures, and sells components for spacecraft. In addition, the Company also offers launch services and other spacecraft and on-orbit management solutions.

84.   Rocket Lab announced that it its plans to develop Neutron, a reusable-ready, medium-capacity launch vehicle, in March 2021.

85.   In early 2024, the Company announced that it would conduct a test launch of Neutron in mid-2025 before offering three commercial launches in 2026 and five

commercial launches in 2027.

**False and Misleading Statements**

***November 12, 2024 Press Release***

86.     On November 12, 2024, Rocket Lab issued the Q3 2024 Earnings Release. In listing the Company's "Significant achievements for the quarter," the Q3 2024 Earnings Release included "***signing a launch service agreement for multiple launches on Neutron with a confidential commercial satellite constellation customer***." In providing a progress update, the Q3 2024 Earnings Release also revealed that there was "continued progress across Neutron and space systems."

87.     The Q3 2024 Earnings Release quoted Defendant Beck, who stated:

> In the third quarter 2024 we once again executed against our end-to-end space strategy with successes and key achievements reached across small and medium launch, as well as space systems. Revenue grew 55% year-on-year to $105 million and we continue to see strong demand growth with our backlog at $1.05 billion. **Significant achievements for the quarter included signing a launch service agreement for multiple launches on Neutron with a confidential commercial satellite constellation customer**; successfully launching twelve Electron launches year-to-date, making 2024 a record year for launches with more still to come; signing $55 million in new Electron launches, further cementing Electron's position as a global launch leader; and being selected by NASA to complete a study contract for a proposal to retrieve samples from Mars and return them to Earth as part of a world-first mission. We expect to close out the year strongly with more Electron launches scheduled in November and December, alongside ***continued progress across Neutron and space systems***, that is behind our guidance for a record $125-$135 million revenue quarter in Q4.

88.     In discussing the Company's "Business Highlights for the Third Quarter 2024, plus updates since September 30, 2024," the Q3 2024 Earnings Release said of Neutron:

- ***Signed a launch service agreement for multiple launches on Neutron with a confidential commercial satellite constellation operator that signifies the beginning of a productive collaboration that could see Neutron deploy the entire constellation***.

- Announced a federal defense contract that supports Neutron and the development of its Archimedes engine with the U.S. Air Force's Research Laboratory.

- Doubled engine testing cadence for Archimedes over the quarter at Rocket Lab's engine test site in Mississippi, alongside strong production execution at the Company's Engine Development Complex in California which included multiple engines manufactured, assembled, and shipped for engine testing.

- ***Significant progress made across Neutron's structures and infrastructure, including the completion of construction on the rocket's Assembly, Integration, and Test (A.I.T.) facility in Virginia***.

- Well-positioned to on-ramp to the U.S. Space Force's National Security Space Launch (NSSL) Lane 1 program, which began accepting proposals in November 2024 to on-ramp new launch providers to an indefinite delivery indefinite quantity (IDIQ) contract valued at $5.6 billion over a five-year period.

89.    Lastly, in discussing the Company's financials, the Q3 2024 Earnings Release held the following table:

| | Three Months Ended September 30, | |
| | 2024 | 2023 |
| --- | --- | --- |
| Revenues | $ 104,808 | $ 67,661 |
| Cost of revenues | 76,812 | 52,694 |
| Gross profit | 27,996 | 14,967 |
| Operating expenses: | | |
| Research and development, net | 47,723 | 26,626 |
| Selling, general and administrative | 32,172 | 27,200 |
| Total operating expenses | 79,895 | 53,826 |
| Operating loss | (51,899) | (38,859) |
| Other income (expense): | | |
| Interest expense, net | (454) | (1,413) |
| Loss on foreign exchange | (490) | (120) |
| Other income, net | 1,848 | 1,176 |
| Total other income (expense), net | 904 | (357) |
| Loss before income taxes | (50,995) | (39,216) |
| Provision for income taxes | (944) | (1,352) |
| Net loss | $ (51,939) | $ (40,568) |
| Net loss per share attributable to Rocket Lab USA, Inc.: | | |
| Basic and diluted | $ (0.10) | $ (0.08) |
| Weighted-average common shares outstanding: | | |
| Basic and diluted | 497,701,715 | 484,034,071 |

### *November 12, 2024 Form 10-Q*

90.    On November 12, 2024, the Company filed its quarterly report on Form 10-Q

for the third quarter of the 2024 Fiscal Year (the "Q3 2024 10-Q"). The Q3 2024 10-Q was signed by Defendants Beck and Spice and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Beck and Spice attesting to the accuracy of the Q3 2024 10-Q and that the Q3 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The Q3 2024 10-Q confirmed the previously reported financial results.

91.    In providing an update on Neutron, the Q3 2024 10-Q stated:

> **We have made significant progress** across Neutron's structures and infrastructure, including the completion of construction on the rocket's Assembly, Integration, and Test (A.I.T.) facility in Virginia. **We have doubled engine testing cadence for Archimedes over the quarter at Rocket Lab's engine test site in Mississippi, alongside strong production execution** at our Engine Development Complex in California which included multiple engines manufactured, assembled, and shipped for engine testing. **We signed a launch service agreement for two dedicated Neutron launches with a confidential commercial satellite constellation customer**.

92.    In discussing the Company's "Key Metrics and Select Financial Data," the Q3 2024 10-Q provided an update on the Company's "Launch Vehicle Build-Rate and Launch Cadence," stating:

> We built approximately eight launch vehicles 2021, approximately 12 launch vehicles in 2022 and approximately 11 launch vehicles in 2023. We built approximately 10 launch vehicles through the nine months ended September 30, 2024. We launched six vehicles in 2021, nine vehicles in 2022 and ten vehicles in 2023. We have launched 11 vehicles through the nine months ended September 30, 2024 and launched 12 vehicles through November 12, 2024. Growth rates between launches and total launch service revenue are not perfectly correlated because our total revenue is affected by other variables, such as the revenue per launch, which can vary considerably based on factors

such as unique orbit and insertion requirements, payload handling needs, launch location, time sensitivity of mission completion and other factors. ***We believe that the growth in our build rate and launch rate is a positive indicator of our ability to scale our launch operations***.

93.    In discussing the Company's revenue growth, the Q3 2024 10-Q stated the following:

***Three Months Ended September 30, 2024 and 2023***

We generated $104.8 million and $67.7 million in revenue for the three months ended September 30, 2024 and 2023, respectively, representing a year-on-year increase in revenue of approximately 55%. This year-on- year increase primarily resulted from space systems revenue growth of $37.5 million, offset by a decrease in launch revenue of $0.4 million due to a lower revenue per launch.

(Emphasis in original).

***November 12, 2024 Earnings Call***

94.    That same day, the Company hosted an earnings call with investors and analysts to discuss the third quarter's financial results (the "Q3 2024 Earnings Call").

95.    During the Q3 2024 Earnings Call, Defendant Spice reaffirmed the mid-2025 launch date in discussing the Company's spending, stating:

[W]e do expect to pick up in cash consumption in the next few quarters, owing to an increased ***expected increase in Neutron spending ahead of our mid-2025 launch*** and lumpiness in large space systems milestone payment collections.

96.    The statements referenced in ¶¶ 86-95 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the initial plans for three barge landing tests were substantially delayed; (2) preparation of the launch pad was delayed by, *inter alia*, a critical potable water issue that was not scheduled to be fixed until January 2026; (3) due to these issues,

it was highly unlikely the Company's Neutron rocket would not be able to launch in mid-2025 as expected; and (4) the Company's sole contract regarding Neutron has made with an unreliable partner at a discount. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Emerges

97.    The truth emerged on February 25, 2025 when the Bleecker Street Research published the Bleecker Street Report, titled "Rocket Lab (RKLB): We Think It's Gonna Be a Long, Long Time." The Bleecker Street Report claimed, *inter alia*, that the Company "has materially misled investors about the likelihood that its Neutron rocket will launch in mid-2025."

98.    Specifically, the Bleecker Street Report claimed, in relevant part:

**Key Points:**

Rocket Lab (RKLB) is a rocket development and space systems company that has seen shares rise 485% over the last year to a $11.2 billion valuation, propelled by investor and analyst excitement over the upcoming launch of Neutron, a medium-lift rocket that RKLB hopes will compete with SpaceX's Falcon 9.

We believe that RKLB has materially misled investors about the likelihood that its Neutron rocket will launch in mid-2025, a timeline the company has repeatedly claimed in media interviews and on earnings calls. In fact, rocket experts we spoke to put the timeline of a rocket launch from mid-2026 to mid-2027, a one to two year delay.

Many aspects of RKLB's Neutron program remain far behind where they need to be: from engine development, to engine and structure production, to launch pad construction, to rocket transport to the launch site, per documents we reviewed and 23 interviews with industry experts, including former Rocket Lab engineers and executives.

99.    In addition, the Bleecker Street Report revealed the rescheduling of three

barge landing tests, originally intended to take place between September 2024 and March 2025, to September 2025 through March 2026. Specifically, the Bleecker Street Report stated:

**Rocket Transportation Delays Put a Launch in 2026 at Best**

\* \* \*

Initially, Rocket Lab and NASA staff had settled on a direct beach landing of a barge from Baltimore. The sand dunes on the barrier would have to be flattened with earth movers, and a temporary platform erected to carry the massive rocket stages from the facility by mobile cranes. This plan had been formalized as a temporary solution in late 2023, and NASA applied for a permit from the Virginia Marine Resource Commission (VMRC) in July 2024. The permit application indicated that the three landings needed for an initial launch would occur between 1 September 2024 and 14 March 2025:

### Part 1 - General Information: Question 4. Detailed Description of the Project:

This project is on the Wallops Island Flight Facility (Appendix B - Graphic 1-1 and 1-2). This JPA is requesting authorization for three (3) barge landing test events onto Wallops Island beach within an area NASA has proposed for these tests south of the Launch Pad O-B at the southern breakwater within the potential barge landing location (Appendix B - Graphic 1-6). The project would temporarily impact the beach area. The barge landing would occur within this location area which allows for minor adjustments in the actual landing location if in-water obstructions are identified. These three test events would occur between September 1, 2024, and March 14, 2025.

\* \* \*

NASA and Rocket Lab initially viewed a beach landing as the sole path for rocket delivery, since other infrastructure like a new bridge would require 1-2 years of additional analysis under the National Environmental Policy construction could even begin.

However, timelines only deteriorated from there. Whereas in July, a September 2024 - March 2025 window was proposed, by October 2024, these plans had changed. An October 15 document submission to NOAA for compliance with Essential Fish Habitat (EFH) assessments showed that

36

Rocket Lab and NASA had opened a new window for landings, now moved back an entire year and starting in September 2025:



UNITED STATES DEPARTMENT OF COMMERCE
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930

October 17, 2024

Lori Levine
WFF Natural Resources Manager
U.S. National Aeronautics and Space Administration
Wallops Flight Facility
Wallops Island, VA 23337

RE:    Essential Fish Habitat Consultation, Wallops Flight Facility Barge Beach Test Landing

Dear Ms. Levine:

We have reviewed the October 15, 2024, essential fish habitat assessment (EFH) worksheet submitted for National Aeronautics and Space Administration's (NASA) proposal to conduct three barge landing test events on the Wallops Island beach within NASA's Wallops Flight Facility (WFF) south of the Launch Pad 0-B at the southern breakwater. The purpose of the project is to perform test events to assess the Neutron rocket parts delivery, rocket construction, and to prepare for the rocket launches from the Mid-Atlantic Regional Spaceport (MARS) on the eastern coast of Virginia from the WFF. The three test events would occur between fall of 2024 and March 14, 2025 or September 1, 2025, and March 14, 2026.

100. The Bleecker Street Report continued to report bad news about the Company, including that there were delays in the Company's launch pad due to a potable water problem. This issue was not scheduled to be fixed until January 2026, further delaying the launch due to the necessity for potable water. Specifically, the Bleecker Street Report stated:

**Wallops Launch Pad Is Behind Schedule, Alternate Transportation Options Won't Help Delay**

While Rocket Lab shows pictures of development on the Wallops launch pad, experts told us the pad looked many months away from being complete. We found local filings corroborate this, and also imply Neutron can't launch before 2026.

"The last picture [of Wallops] I saw, I'd be surprised if they were going to be done by the end of year and have everything good to go from a regulatory perspective… there was a lot more dirt to be dug and structures to be installed." –Former Rocket Lab Executive

January 2025 The space and rocket infrastructure at Wallops, officially named the Mid Atlantic Regional Spaceport (MARS), is supported by NASA, but the funding and contract management runs through the State of Virginia-managed Virginia Spaceport Authority. This unique arrangement forces all work at the facility to be managed in compliance with Virginia State appropriation and funding law.

In particular, construction at the launch pad can be tracked via Virginia's Procurement system (https://eva.virginia.gov/). We have been following progress at MARS for hints about where Rocket Lab stands on this front, and our research shows that numerous projects required for Rocket Lab to begin Neutron operations are well behind schedule. In fact, the entire island has a potable water problem that won't get fixed until early 2026. Potable water is a requirement for launch.

Recent inspections of the Wallops utility water system in connection with a bridge widening project show a "catastrophic deterioration" of the water supply. This problem will not be fixed until January 2, 2026:

The specific purpose of the project is to allow NASA, its tenants, and customers to continue transporting personnel, mission hardware, and equipment via roadway and bridge to Wallops Island once the existing Causeway Bridge is decommissioned at the end of its service life, as well as to replace several utility lines providing electric, water, and sewer services to Wallops Island that are currently attached to the existing Causeway Bridge. The utilities need to be replaced and relocated to continue uninterrupted service to Wallops Island. Additionally, recent inspections of the water utility infrastructure showed catastrophic deterioration of the potable water supply to Wallops Island, which require imminent attention. If the existing utilities are not replaced, Wallops Island would not receive potable water due to the deterioration of the utility lines. This would pose a major safety concern as potable water is used not only for drinking but also for building fire suppression systems and heat and acoustic vibration deluge during rocket launches.

## 19.0 BRIDGE CONSTRUCTION AND UTILITY RELOCATION SCHEDULE

Bridge construction will take place from February 12th, 2025, to August 11th, 2027.

Roadway construction will take place from January 25th, 2025, to December 7th, 2027.

Utility relocations will take place from September 3rd, 2025, to January 2nd, 2026.

Fender/dolphin systems will be installed from July 1st, 2027, to August 13th, 2027.

Oyster relocation will take place in March 2024.

Existing bridge demolition will take place from December 29th, 2027, to August 30th, 2028.

One NASA range engineer currently stationed at Kennedy Space Center told us that the availability of water was mission critical for deluge suppression systems and that its availability would dictate not only launches, but forms a

prerequisite for construction of the final portion of the Neutron pad itself.

"Having all of the piping, emergency infrastructure to support some catastrophic event, all of the software demonstrated and proven, is all another piece. Getting a picture of a pad and a stand? Great. But there is a lot behind that that is less interesting from a picture perspective, but is very important, and that all takes time… And if one thing is off, you have to take multiple steps backward and prove that everything you just changed still works the way that you did when you tested and qualified it weeks or months prior." – Aerospace Executive

We confirmed that the critical issues in the potable water system were well known prior to Rocket Lab's November earnings call. Certified plans for the reconstruction of potable water lines were dated the first week of November 2024. As with the rocket transportation setbacks, Rocket Lab did not address any of these issues to investors, instead remarking airily that on the regulatory front, "there's nothing that's kind of out of bed at the moment."

101.    The Bleecker Street Report also shed light on the sole contract the Company has in place for Neutron, namely that it is with an "unreliable startup" called E-Space, which the Bleecker Street Report describes as "risk item." In addition, this contract supposedly is "not a full-price deal, contrary to what Rocket Lab has said." In full, the Bleecker Street Report stated:

**Rocket Lab Appears to Have Misled About Neutron Launch Contract Pricing; We Believe its Unnamed Customer is E-Space, A Startup with Questionable Ability to Pay For and Deliver a Constellation to the Pad**

* * *

We believe that Rocket Lab's first and so far only Neutron contract is not a full-price deal, contrary to what Rocket Lab's has said, and the unnamed customer is an unreliable startup named E-Space. In November 2024, Rocket Lab announced it had signed a two-launch contract with a "confidential commercial satellite constellation operator" slated for mid- 2026. On the Q3 2024 earnings call that month, Peter Beck insisted that the contract was "in line" with standard Neutron pricing of $50-$55 million:

Analyst: "And then you stated that the ASPs, you're going to be pretty firm on pricing. Is that the $50 million to $55 million that you initially talked about, and that's sort of where things have settled maybe for these 2 dedicated missions?

Peter Beck: "Yes. I mean the launch pricing, as we pointed out, is -- that was a really important thing for us. And I think as I've said, I made -- well, I kind of had to, but with Electron, it took us years to flush out bad contracts with respect to ASP. So no, ***this contract is in line with our previously discussed ASP for Neutron***."

However, it is unheard of for a launch vehicle with no reliability track record to charge full-freight pricing, so this statement appears to be a lie or at best, a misdirection. Industry experts, including former Rocket Lab employees, were skeptical of the value of the contract and the wording used to describe it, and they suspected that Rocket Lab was discounting the contract significantly:

"It would be pretty typical to be flying the first few flights at a discount, because as a customer you're taking so much risk on something that hasn't been proven yet... If you're a commercial customer and you're spending $40 or $50 million, you're going to go with the most reliable vehicle unless you were offered a significant discount." –Former Senior RKLB Engineer

In fact, significantly discounted contract pricing may reflect Rocket Lab's acknowledgement that Neutron performance will fall short of its advertised 13,000 kg payload capacity:

"[If] you're not sure if you can hit the full performance that you're out there talking about publicly, and you have this vehicle where you're going to do a first test flight… you can't exactly go out and sign a contract where you're signing up to that full performance… ***They're not coming out and saying 'hey, this customer paid standard pricing', they're saying it's 'in line', because lesser performance is going to be indicative of a lesser price tag, and so I think where that type of diction comes from***."

"If it were me writing this contract… I would basically say if we're at this performance level, it's going to be X dollars, if we can hit higher than that, it's going to be this [higher] amount of dollars, and if we can hit what we're saying publicly, the 13,000 kg [of payload to LEO], if we can hit that performance curve, in this case I would assume they would try to push the standard pricing. ***All the payment terms would be baselined at the very lowest***

***level that was discussed and can be signed up to, and that's going to be the one that's planned for***." –Former RKLB Executive

The background of the mystery customer lines up with someone willing to accept a deeply discounted flight on a rocket with no track record. We believe it is a startup called E-Space, run by entrepreneur Greg Wyler, who has a colorful and promotional history. We arrive at that conclusion in the following way: last November, Electron launched a satellite, Protosat-1, for a confidential customer. E-Space, for its part, had received clearance to send a payload to New Zealand in September (permit 2425-0903). September is just after RKLB's confidential customer would have signed the launch contract, which carried a tight two-month turnaround from agreement to launch. As a final clue, Protosat-1 was registered under the flag of Rwanda, to which E-Space and Wyler have business ties.

A person we spoke to with knowledge of the industry agreed with our assessment:

"Rocket Lab has come out and said it's a secretive first customer, which boils the population down to a handful in the space industry, because if people are going to launch their constellation, they want to be public about it because they're raising more money. So there's no point being secretive. Now you're down to AST [Spacemobile], Apple, and Greg Wyler, basically. But Pete [Beck] actually came out and said that Neutron could potentially launch the entire constellation, whereas Apple's already signed up with other launch providers, so that kind of discounts them if we're to take Pete at his word."

We believe E-Space is a lot more bluff than substance when it comes to actually getting things done. Wyler is a serial entrepreneur who founded the constellation OneWeb but left in 2017, before it had launched a single satellite; OneWeb went bankrupt in 2020. There is an odd information vacuum surrounding E-Space: there isn't even a coherent description of their service on their website, which is laden with buzzwords. Where Wyler has made public pronouncements about E-Space, they have tended to be extreme, claiming that E-Space would put 100,000 or 327,000 satellites in orbit, making them by far the largest constellation in the world. Several senior executives and a board member have all churned out of the young company, for Wyler:

"The other angle [to view E-Space from] is that Greg has gone from ship to ship basically trying to extract as much personal value as he can, and as soon

Verified Shareholder Derivative Complaint

as he does that he's on to his next venture. This is kind of just the next one, where he's very secretive, so he has people guessing, he's trying to raise money, he's trying to be in more unique places where investments in space aren't as fruitful, like Africa, and trying to extract as much value [as he can]. And meanwhile he'll just do the same thing and move on again. On a personal level, I wish him success, but I can also understand the school of thought of him just coming in, burning the ships, taking as much loot as he can, and moving on to the next venture before people realize what happened." –Person with knowledge of the industry

We asked the same person, "Is Greg Wyler money-good for the Neutron launches?"

Person with knowledge of the industry: "I consider that a risk item, quite frankly, because I don't know who's backing him, I don't know how much they're backing him for… he's going to need hundreds of millions of dollars to get things even initially off the ground. The other risk item is schedule… like, who's building these satellites? He's got this one pathfinder [satellite] up there… I don't think he has the operational size to do a number of these. How is this all going to work out? From the perspective of him getting close to that [Rocket Lab] launch date and going 'Well, we're quite frankly just not ready' and having that [first commercial launch of Neutron] push out, I think that is also a factor there… I've got to wonder where Greg is going to get all his funds from… It's not a great first [Neutron][ customer, and that's because Pete [Beck]… thinks he can hold on price, and people are kind of sitting there and going, 'This is a new launch vehicle, it's fraught with risk. I'm not paying standard price.'"

A senior aerospace executive agreed that the company is a poor get for Rocket Lab:

"They [E-Space] haven't even made it past [Series A] and it's been four years… They're probably not going to build a multi-100 satellite constellation with that size and that funding raised. I don't see much progress to say that's a real customer today. Rocket Lab need to show a more real customer than that."

To the extent Neutron's sole existing launch customer can't pay or walks away from the launch, that will further hurt cash flow in an already cash-constrained business. For all the foregoing reasons, It appears that Rocket Lab's cash flow needs are going to be extreme as a result of delays and

Verified Shareholder Derivative Complaint

profitability challenges with Neutron.

102.   On this news, the price of the Company's stock fell $2.21 per share, or approximately 9.8%, from a close of $22.49 per share on February 24, 2025, to close at $20.28 per share on February 25, 2025.

## DAMAGES TO ROCKET LAB

103.   As a direct and proximate result of the Individual Defendants' conduct, Rocket Lab has lost and will continue to lose and expend many millions of dollars.

104.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

105.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

106.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

107.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

108.   As a direct and proximate result of the Individual Defendants' conduct, Rocket Lab has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

109.    Plaintiff brings this action derivatively and for the benefit of Rocket Lab to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Rocket Lab, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

110.    Rocket Lab is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

111.    Plaintiff is, and has been at all relevant times, a shareholder of Rocket Lab. Plaintiff will adequately and fairly represent the interests of Rocket Lab in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

112.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

113.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Rocket Lab's Board consisted of the following eight individuals: Defendants Beck, Armagno, Frank, Ocko, Olson, Possenriede, Saintil, and Slusky (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants that were on the Board at the time this action was filed.

114.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

115.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Rocket Lab to issue materially false and

misleading statements. Specifically, the Director-Defendants caused Rocket Lab to issue false and misleading statements which were intended to make Rocket Lab appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

116.    Additional reasons that demand on Defendant Beck is futile follow. Defendant Beck founded the Company in 2006, and has served on the Board and as President and CEO of the Company since July 2013. Defendant Beck has served as the Chairman of Board since May 2021. The Company provides Defendant Beck with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Beck is a defendant in the Securities Class Action. For these reasons, too, Defendant Beck breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.    Additional reasons that demand on Defendant Armagno is futile follow. Defendant Armagno has served as a Company director since November 2023. She also serves as the Chair of the Government Security Committee and as a member of the Nominating and Corporate Governance Committee. As a trusted director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Armagno has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $236,345. For these reasons, too, Defendant Armagno breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

118. Additional reasons that demand on Defendant Frank is futile follow. Defendant Frank has served as a Company director since September 2022. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Frank breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119. Additional reasons that demand on Defendant Ocko is futile follow. Defendant Ocko has served as a Company director since August 2021. He also serves as a member of the Compensation Committee. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Ocko breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120. Additional reasons that demand on Defendant Olson is futile follow.

Defendant Olson has served as a Company director since August 2021. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Olson has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $1 million. For these reasons, too, Defendant Olson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.  Additional reasons that demand on Defendant Possenriede is futile follow. Defendant Possenriede has served as a Company director since August 2024. He also serves as a member of the Audit Committee. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Possenriede breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.  Additional reasons that demand on Defendant Saintil is futile follow. Defendant Saintil has served as a Company director since June 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. As a trusted director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement

in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Saintil has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $1.3 million. For these reasons, too, Defendant Saintil breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

123. Additional reasons that demand on Defendant Slusky is futile follow. Defendant Slusky has served as a Company director since August 2021. As a trusted director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Slusky has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $2.4 million. For these reasons, too, Defendant Slusky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124. Additional reasons that demand on the Board is futile follow.

125. Defendants Olson (as Chair), Frank, and Possenriede served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to

engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

126. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

127. Rocket Lab has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Rocket Lab any part of the damages Rocket Lab suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

128. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-

Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

129.   The acts complained of herein constitute violations of fiduciary duties owed by Rocket Lab's officers and directors, and these acts are incapable of ratification.

130.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Rocket Lab. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Rocket Lab, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

131.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Rocket Lab to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

132.   Thus, for all of the reasons set forth above, all of the Director-Defendants,

and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

133.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Rocket Lab's business and affairs.

135.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

136.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Rocket Lab.

137.   In breach of their fiduciary duties owed to Rocket Lab, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the initial plans for three barge landing tests were substantially delayed; (2) preparation of the launch pad was delayed by, *inter alia*, a critical potable water issue that was not scheduled to be fixed until January 2026; (3) due to these issues, it was highly unlikely the Company's Neutron rocket would not be able to launch in mid-2025 as expected; and (4) the Company's sole contract regarding Neutron has made with an unreliable partner at a discount. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

138.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

139.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

140.   In yet further breach of their fiduciary duties, during the Relevant Period, while shares of Company common stock traded at artificially inflated prices before the fraud was exposed, five of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $6.4 million.

141.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Rocket Lab's securities.

142.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Rocket Lab's securities. The Individual Defendants, in

good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

143.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

144.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Rocket Lab has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

145.    Plaintiff, on behalf of Rocket Lab, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

146.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Rocket Lab.

148.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Rocket Lab that was tied to the performance or artificially inflated valuation of Rocket Lab, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

149.    Plaintiff, as a shareholder and a representative of Rocket Lab, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their

fiduciary and contractual duties.

150.   Plaintiff, on behalf of Rocket Lab, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Abuse of Control**

151.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Rocket Lab, for which they are legally responsible.

153.   As a direct and proximate result of the Individual Defendants' abuse of control, Rocket Lab has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

154.   Plaintiff, on behalf of Rocket Lab, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

155.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Rocket Lab in a manner consistent with the operations of a publicly held corporation.

157.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Rocket Lab has sustained and will continue to sustain significant damages.

158.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

159.   Plaintiff, on behalf of Rocket Lab, has no adequate remedy at law.

### FIFTH CLAIM
**Against Individual Defendants for Waste of Corporate Assets**

160.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

162.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Rocket Lab to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

163.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

164.    Plaintiff, on behalf of Rocket Lab, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Beck and Spice for Contribution Under Sections 10(b) and 21D of the Exchange Act

165.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.    Rocket Lab and Defendants Beck and Spice are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Beck's and Defendant Spice's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

167.    Defendants Beck and Spice, because of their positions of control and authority as controlling shareholder, officers and/or directors of the Company, were able to and did,

directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

168.   Accordingly, Defendants Beck and Spice are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

169.   As such, Rocket Lab is entitled to receive all appropriate contribution or indemnification from Defendants Beck and Spice.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Rocket Lab, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Rocket Lab;

(c)   Determining and awarding to Rocket Lab the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Rocket Lab and the Individual Defendants to take all necessary actions to reform and improve Rocket Lab's corporate governance and internal procedures to comply with applicable laws and to protect Rocket Lab and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and

develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Rocket Lab to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Rocket Lab restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 13, 2025                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest_____
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Jeffrey Nagle, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __ day of March, 2025.

12

DocuSigned by:

*Jeffrey Nagle*

1EF1394A8B7A432...

Jeffrey Nagle